UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————————

BECKY PINKSTON-POLING, individually
and on behalf of all others similarly situated,

         Plaintiff,

v.                                  Case No.  1:15-CV-1208

ADVIA CREDIT UNION,                HON. GORDON J. QUIST

         Defendant.

_____/

**<u>OPINION</u>**

Plaintiff, Becky Pinkston-Poling, has filed an amended class-action complaint against Defendant, Advia Credit Union (Advia), alleging claims of breach of contract and violation of the Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693, *et seq.*  Both claims are based on Pinkston-Poling's allegation that Advia applies its overdraft fee program in a different manner than Advia describes in its agreements with, and disclosures to, its members.  That is, Pinkston-Poling alleges that Advia charges overdraft fees based on the so-called "available balance" in a member's account rather than the "actual" or "ledger" balance, as Advia's written agreements state, resulting in overdraft fees even when sufficient funds are in the account to pay the item.

Advia has filed a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Pinkston-Poling's amended complaint for failure to state a claim. The Court heard oral argument on the motion on October 7, 2016.  Following the hearing, the Court ordered the parties to file additional briefs on the issues of whether the safe harbor provision of the EFTA, 15 U.S.C. § 1693m(d)(2), bars Pinkston-Poling's EFTA claim and, if so, why this Court has jurisdiction under

the Class Action Fairness Act of 2005 (CAFA).  (ECF No. 34.)  The parties have filed their supplemental briefs, and the matter is ready for decision.

For the following reasons, the Court will deny Advia's motion.

## I. FACTS

The following facts are taken from Pinkston-Poling's amended complaint.

Advia is a Michigan-based credit union with branches throughout Michigan, Wisconsin, and Illinois.  (ECF No. 11 at PageID.162.)  Pinkston-Poling was a member of Advia and had a checking account that included a debit card that she could use to withdraw funds from ATM machines, pay for point-of-sale purchases, and perform other financial transactions.  (*Id* at PageID.161, 166.)

Pinkston-Poling alleges that Advia's overdraft program, known as Courtesy Pay, is different than what Advia describes in its Member Account Agreement & Truth in Savings Disclosure (Member Account Agreement), different than what Advia represents to its members, and not what its members expect based on Advia's representations.  (*Id.* at PageID.164.)  In particular, Pinkston-Poling alleges, Advia says that it will charge an overdraft fee only when the member's actual/ledger account balance—the amount of money in the account without any reduction for anticipated future debits—is  not sufficient to pay the item.  (*Id.*)  Pinkston-Poling also alleges that Advia's separate agreement required by Regulation E of the EFTA for ATM withdrawals and one-time debit transactions (Opt-in Agreement) similarly provides that an overdraft occurs when the member's actual/ledger account balance is insufficient to cover a transaction.  (*Id.* at PageID.165, 192.)  Pinkston-Poling alleges that, in contrast to the provisions in the Member Account Agreement and the Opt-in Agreement, which require Advia to use the actual/ledger balance in determining whether there is an overdraft, Advia uses the available balance—an artificial internal calculation that

subtracts anticipated future debits from the actual balance—which allows Advia to charge overdraft fees even when the member has sufficient funds in her account to pay the item. (*Id.* at PageID.165.)

Pinkston-Poling alleges that Advia's use of the available balance to assess overdraft fees breaches both the Member Account Agreement and the Opt-in Agreement and violates the EFTA because the Opt-in Agreement fails to accurately describe Advia's overdraft program for ATM and non-recurring debit card transactions. Pinkston-Poling claims that she was harmed by this practice on June 27, 2015, when she had an actual balance of $30.48 in her account before a $7.00 debit card transaction was posted, leaving her with an actual balance of $23.48. However, Advia charged Pinkston-Poling an overdraft fee of $32.00 for this $7.00 transaction. (*Id.* at PageID.166.)

## II. DISCUSSION

### A.    Applicability of 15 U.S.C. § 1693(D)(2)

Initially, the Court addresses whether the safe harbor provision, 15 U.S.C. § 1693m(d)(2), applies in this case because in its October 7, 2016, Order to Show Cause, the Court indicated that if the safe harbor provision precludes Pinkston-Poling's EFTA claim, the Court may lack jurisdiction under CAFA. Having read the parties' briefs in response to the Order to Show Cause, the Court concludes that the safe harbor provision does not bar Pinkston-Poling's EFTA claim and, therefore, the Court has subject matter jurisdiction.

In considering whether the safe harbor provision applies in the instant case, the Court must bear in mind that the EFTA is a remedial statute designed to protect consumers and, therefore, must be given "'a broad, liberal construction in favor of the consumer.'" *Clemmer v. Key Bank Nat'l Ass'n*, 539 F.3d 349, 353 (6th Cir. 2008) (quoting *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 163 F.3d 948, 950 (6th Cir. 1998)). In addition, "exclusions or exceptions should be construed narrowly." *In re Carter*, 553 F.3d 979, 985 (6th Cir. 2009) (internal quotation marks omitted).

Pinkston-Poling alleges that Advia violated the EFTA by failing to comply with Regulation E's Opt-in Rule governing overdraft fees for ATM and one-time debit card transactions, 12 C.F.R. § 1005.17.  In particular, the regulation states:

(1)  General.  Except as provided under paragraph (c) of this section, a financial institution holding a consumer's account shall not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, unless the institution:

(I) Provides the consumer with a notice in writing, or if the consumer agrees, electronically, segregated from all other information, *describing the institution's overdraft service* . . . .

12 C.F.R. § 1005.17(b)(1)(I) (italics added).  The content and format provision states that the required notice "shall be substantially similar to Model Form A-9 set forth in appendix A of this part, [and] include all applicable items in this paragraph . . . [including] [a] brief description of the financial institution's overdraft service . . . ."  12 C.F.R. § 1005.17(d)(1).    The safe harbor provision provides, in pertinent part: "No provision of this section or section 916 imposing any liability shall apply to . . . (2) any failure to make disclosure *in proper form* if a financial institution utilized an appropriate model clause issued by the Board."  15 U.S.C. § 1693m(d)(2) (italics added).[1]

As set forth in the October 7, 2016 Order, the only issue is whether Advia's Opt-in Agreement—which the parties agree is substantially similar to Model Form A-9—triggers application of the safe harbor provision.  Advia argues that the safe harbor provision applies because the content and format subsection of Regulation E requires financial institutions to provide a notice "substantially similar to Model Form A-9" and prohibits the inclusion of information not specified in 12 C.F.R. § 1005.17(d), and it is undisputed that Advia's Opt-in Agreement was substantially similar to Model Form A-9.  Pinkston-Poling argues that the safe harbor provision does not apply

[1] Although the parties discuss the "good faith" defense in 15 U.S.C. § 1693m(d)(1) in their briefs, the Court does not consider that provision because Advia did not raise the "good faith" defense in its initial briefs or at oral argument.

4

because she is not alleging that Advia failed to make a disclosure or a proper disclosure, but instead that Advia failed to accurately describe its overdraft service as required by Regulation E. Pinkston-Poling further argues that, even if liability in this case is based on failure to make a disclosure, her claim is based on the inadequacy of the content, not the form, of Advia's Opt-in Agreement. Finally, Pinkston-Poling argues that, in any event, Model Form A-9 is not "an appropriate" form because it does not accurately describe Advia's overdraft service, which is based on the available balance method rather than the actual balance method.

Although the Court "tentatively" concluded in its Order that the safe harbor provision precludes Pinkston-Poling's EFTA claim, having further considered the issue in light of the parties' briefs, the Court now concludes that the safe harbor provision does not apply because Pinkston-Poling is not alleging that Advia failed to make a disclosure or to disclose something in proper form. Instead, she alleges that Advia "fail[ed] to truthfully and accurately describe . . . the conditions under which an overdraft fee will be assessed." (ECF No. 11 at PageID.173.) As noted, Regulation E precludes a financial institution from charging an overdraft fee on an ATM or one-time debit card transaction unless it provides the consumer "a notice . . . describing the institution's overdraft service." 12 C.F.R. § 1005.17(b)(1)(I). Although the notice must be "substantially similar to Model Form A-9," 12 C.F.R. § 1005.17(d), it must describe "the *financial institution's* overdraft service." 12 C.F.R. § 1005.17(d)(1) (italics added). In its "Official Interpretations" of Regulation E at 12 C.F.R. pt. 1005 Supp. 1, the Consumer Protection Financial Bureau (CPFB) discusses the use of model forms and clauses. It states that "[i]f an institution uses these clauses *accurately to reflect its service*, the institution is protected from liability for failure to make disclosures in proper form."[2]

---

[2] The CFPB's official interpretation of its own regulation warrants deference "unless 'demonstrably irrational.'" *Strubel v. Capital One Bank (USA), N.A.*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (citing *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 211, 131 S. Ct. 871, 882 (2011)).

(Italics added).  Assuming that the safe harbor provision's reference to "model clause" should also be construed to cover use of a "model form," its protection would not extend to Pinkston-Poling's claim because she is alleging that her consent to pay the overdraft fee was invalid because Advia's Opt-in Agreement failed to accurately describe Advia's overdraft service.

Few courts have considered the scope of Regulation E's safe harbor provision.  One court has observed, however, that "the statutory language [of the safe harbor provision] suggests that this defense insulates an institution only from a challenge as to the form—not the adequacy—of the disclosure."  *Berenson v. Nat'l Fin. Servs., LLC*, 403 F. Supp. 2d 133, 151 (D. Mass. 2005).  This conclusion is consistent with the ordinary meaning of the word "form," which is "the shape and structure of something as distinguished from the material of which it is composed."  Webster's Third New International Dictionary 892 (1976).  Similarly, regarding "form," Blacks Law Dictionary states: "In contradistinction to 'substance,' 'form' means the legal or technical manner or order to be observed in the legal instruments or juridical proceedings, or in the construction of legal documents or processes.  Antithesis of 'substance.'" Black's Law Dictionary 586 (5th ed. 1979).  Courts adhere to the distinction between form and substance.  For example, in *Jacks v. Schneider Securities, Inc.*, 217 F.3d 525 (7th Cir. 2000), after concluding that the plaintiff "sent the letters in the proper form," the court went on examine "whether the content of [the plaintiff's] letters was sufficient to satisfy [the statute]."  *Id.* at 528; *see also Swenson v. Cnty. of Kootenai*, No. 2:13-cv-00026, 2014 WL 585726, at *2 (D. Idaho Feb. 14, 2014) (stating that new affidavits were "not to differ in any way from the content of the original affidavits, other than to correct the format so that they are executed in proper form"); *Ellison v. N.H. Dep't of Corr.*, 07-cv-131, 2009 WL 424535, at *5 (D.N.H. Feb. 19, 2009) (noting in the context of a prisoner's exhaustion of administrative

remedies, "use of the proper form facilitates the correctional administrators' assessment and analysis of an appeal's content").

In short, because Pinkston-Poling complains about the accuracy of the Opt-in Agreement's description of Advia's overdraft service, *i.e.*, its content or substance, and not the form of the notice, the safe harbor provision does not bar Pinkston-Poling's EFTA claim.

**B.    Pinkston-Poling has Stated a Valid Breach of Contract Claim**

Pinkston-Poling alleges that Advia breached both the Member Account Agreement and the Opt-in Agreement by charging her an overdraft fee on the available balance, instead of the actual balance, in her account.  She further alleges that Advia breached the implied covenant of good faith and fair dealing by engaging in this practice.

To establish a claim for breach of contract, a plaintiff must show: (1) the existence of a valid and enforceable contract between the parties; (2) the terms of the contract; (3) that the defendant breached the contract; and (4) that the plaintiff suffered an injury as a result of the breach.  *Timmis v. Sulzer Intermedics, Inc.*, 157 F. Supp. 2d 775, 777 (E.D. Mich. 2001) (citing *Webster v. Edward D. Jones & Co.*, 197 F.3d 815, 819 (6th Cir. 1999)).  Contracts should be construed to give effect to the intentions of the parties and to give a reasonable meaning to all provisions.  *Klever v. Klever*, 333 Mich. 179, 186, 52 N.W.2d 653, 656–57 (1952).  If the language of the contract is clear and unambiguous, the court should construe it according to its plain sense and meaning.  *Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 473 Mich. 188, 198, 702 N.W.2d 106, 113 (2005) (quoting *New Amsterdam Cas. Co. v. Sokolowski*, 374 Mich. 340, 342, 132 N.W.2d 66 (1965)).  A contract is ambiguous if its provisions are capable of conflicting interpretations.  *Klapp v. United Ins. Grp. Agency, Inc.*, 468 Mich. 459, 467, 663 N.W.2d 447, 453 (2003) (citing *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 460 Mich. 558, 566, 596 N.W.2d 915, 919 (1999)).  Ambiguity exists only if

there are two or more reasonable interpretations or if the provisions cannot be reconciled with each other. *Meagher v. Wayne State Univ.*, 222 Mich. App. 700, 722, 565 N.W.2d 401, 415 (1997). A court may not rewrite a contract under the guise of interpretation if the terms are clear and unambiguous. *Harbor Park Mkt., Inc. v. Gronda*, 277 Mich. App. 126, 130–31, 743 N.W.2d 585, 588 (2007) (quoting *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 207, 476 N.W.2d 392 (1991)).

Under Michigan law, "the covenant of good faith and fair dealing is an implied promise contained in every contract that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hammond v. United of Oakland, Inc.*, 193 Mich. App. 146, 151–52, 483 N.W.2d 652, 655 (1992) (internal quotation marks omitted)). When a contract gives a party discretion as to the manner of performance, the law implies a duty to exercise such discretion in honestly and in good faith. *Ferrell v. Vic Tanny Int'l, Inc.*, 137 Mich. App. 238, 243, 357 N.W.2d 669, 672 (1984) (citing 3A Corbin on Contracts, § 644, pp. 78–84).

### 1.    Member Account Agreement

The Member Account Agreement states, under the heading, "Payment Order of Items," "[i]f an item is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item (NSF)." (ECF No. 11 at PageID.178.) In a separate paragraph, the Member Account Agreement describes the Courtesy Pay program:

> Courtesy Pay is a discretionary service that allows us to pay charges against our member's checking account even if it causes the account to become overdrawn. Courtesy Pay may provide certain account holders in "good standing" with the ability to overdraw their personal checking account. *We are not obligated to pay any item presented for payment if your account does not contain sufficient funds.* . . .Whether we pay or return an item, your account will be assessed an Overdraft fee. This non-contractual courtesy of paying overdrafts requires no accountholder action. It is not a loan. No additional agreements need to be signed, and it costs nothing

8

> unless the privilege is used—by initiating checks, electronic fund transfers, or other payment or withdrawal requests for more than is on deposit in the account.  Certain transactions including ATM and one-time debit require additional opt-in pursuant to federal law. . . .

(*Id.* at PageID.179 (italics added).)

Pinkston-Poling argues that the language in "Payment of Order of Items" and the italicized language in the Courtesy Pay paragraph makes clear that an account holder is entitled to use all of the funds in her account—the actual/ledger balance—without any reduction for pending debit card transactions.  Pinkston-Poling further notes that the term "account" is not modified in any way, and nothing in the Member Account Agreement defines the term "available balance" or explains how the available balance limits the amount of funds the customer may use.  Advia argues, however, that following language defeats the breach of contract claim:

> No additional agreements need to be signed , and it costs nothing unless the privilege is used—by initiating checks, electronic fund transfers, or other payment or withdrawal requests for more than is on deposit in the account.

Advia contends that this language shows that the Courtesy Pay program is triggered when a customer initiates charges that exceed her account balance.  Advia further argues that Pinkston-Poling attempts to rewrite the above language by changing "by initiating checks, electronic fund transfers, or other payment or withdrawal requests for more than is on deposit in the account," to "by presenting items for payment for more than is on deposit in the account."  (ECF No. 12 at PageID.204.)

Pinkston-Poling has sufficiently stated a claim for breach of contract and breach of the implied covenant of good faith and fair dealing based on the above-quoted provisions, which simply state that Advia will charge an overdraft fee when the account does not contain sufficient funds.  Arguably, the pertinent language could be construed to mean that an overdraft fee will not be charged unless the presented item exceeds the actual/ledger balance, and not the available balance.

9

On the other hand, because the Member Account Agreement does not define the term "account" or state how sufficient funds is determined, the cited provisions are ambiguous. Faced with similar language, other courts have found an ambiguity and allowed the plaintiff's claim to proceed. For example, in *Gunter v. United Federal Credit Union*, 3:15-cv-00483-MMD-WGC, 2016 WL 3457009 (D. Nev. June 22, 2016), the court denied the defendant's motion to dismiss the plaintiff's breach of contract claim because it concluded that the account agreement was ambiguous as to whether the actual balance or the available balance should be used to determine overdraft status. *Id.* at *3. Pinkston-Poling's breach of contract claim may be stronger than the breach of contract claim in *Gunter* because, unlike the instant case, the agreement in *Gunter* included a provision stating that the defendant retained the right to determine the amount of available funds in the customer's account for purposes of deciding whether to return an item for insufficient funds. Nonetheless, the *Gunter* court concluded that the provision did not apply to the determination of whether an overdraft occurred and, therefore, found the agreement ambiguous. *Id.*; *see also In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 623–24 (D.S.C. 2015) (MDL) (concluding that the plaintiffs stated a breach of contract claim even though the agreement used the term "available balance" at least once to describe when overdraft fees would be assessed because the plaintiffs presented a plausible interpretation of the agreement). In *Chambers v. NASA Federal Credit Union*, __ F. Supp. 3d __, 2016 WL 6155930 (D.D.C. 2016), decided since oral argument in the instant case, the court granted the defendant's motion to dismiss the plaintiff's breach of contract claims. However, the account agreement at issue in *Chambers* contained several references to "available" funds in the account, which, the court concluded, linked overdrafts to the account's available balance. *Id.* at *5 (stating that provisions referencing the available balance "unambiguously link[ed] overdrafts to the available balance"). In the instant case, Advia fails to point to any similar provisions in the Member

10

Account Agreement suggesting that the available balance determines the overdraft status of an account. Given that the Member Account Agreement is, at best, ambiguous as to the method to be used in determining whether an account has sufficient funds to pay an item, Pinkston-Poling has sufficiently stated a claim for breach of contract and breach of the implied covenant of good faith and fair dealing.

The provision on which Advia relies addresses when the Courtesy Pay program is triggered, not how the account balance is determined for purposes of overdraft status. Thus, Advia fails to show that Pinkston-Poling's claim is refuted by an express provision of the Member Account Agreement.[3]

### 2. Opt-in Agreement

Pinkston-Poling argues that the Opt-in Agreement is a separate agreement that supports a breach of contract claim. In particular, the Opt-in Agreement states: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we have the option to pay it anyway." (ECF No. 11 at PageID.192.) Other courts have held that such language, or similar language, can support a claim for breach of contract based on the defendant's use of an available balance to impose overdraft fees. *See Gunter*, 2016 WL 3457009, at *3; *Hernandez v. Point Loma Credit Union*, No. 37-2013-00053519 (San Diego Cnty. Superior Court June 24, 2016) (ECF No. 26 at PageID.422–23.) Such courts have found that Opt-in Agreements like the one at issue in the instant case constitute contracts. *See Chambers*, 2016 WL at *3 (concluding that the defendant's opt-in agreement was a contract because when the plaintiff opted-in to the overdraft program, she

---

[3]In its reply brief, Advia argues that Pinkston-Poling's interpretation should be rejected because it would allow customers to commit felonies by check kiting. (ECF No. 15 at PageID.273–74.) This argument lacks merit. Advia's own practice of charging overdraft fees on checks only after they post also allows customers to engage in check kiting, yet, Advia still engages in this practice.

accepted the defendant's offer "to pay overdrafts on one-time debit card transactions in exchange for overdraft fees").

Advia does not dispute that the Opt-in Agreement constitutes a contract.  Instead, it argues that because the Member Account Agreement says that "[c]ertain transactions including ATM and one-time debit require additional opt-in pursuant to federal law," the Opt-in Agreement and the Member Account Agreement are one contract that must be construed together.  The case law that Advia cites, however, states that "[i]t is well-settled law in Michigan that, where a written contract refers to another instrument and makes the terms of the other instrument a part of the written agreement, the separate instruments are construed together as the agreement of the parties." *Charles J. Rogers, Inc. v. Michigan*, 36 Mich. App. 620, 626, 194 N.W.2d 203, 207 (1971) (citing *Whittlesey v. Herbrand Co.*, 217 Mich. 625, 187 N.W.279 (1922)).  While the Member Account Agreement states that an additional opt-in agreement is required, it does not expressly incorporate the terms of the Opt-in Agreement.  Thus, the Opt-in Agreement is a separate contract.[4]

## C.    Pinkston-Poling Alleges a Valid EFTA Claim

As set forth above in section II.A., Pinkston-Poling alleges that Advia violated regulation E of the EFTA because the Opt-in Agreement failed to adequately describe Advia's overdraft service, as required by 12 C.F.R. § 1005.17(d)(1).  The notice must be "clear and readily understandable." 12 C.F.R. § 205.4(a)(1).  The language in the Opt-in Agreement, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we have the option to pay it anyway," does not meet this standard because it is ambiguous as to whether Advia

---

[4]Advia does not make a separate argument that there is no language in the Opt-in Agreement that supports Pinkston-Poling's breach of contract claim.  In *Chambers*, although the opt-in agreement contained essentially the same language as the Opt-in Agreement in the instant case, the court held that it did not support the plaintiffs' claim because the opening paragraph gave examples of when an overdraft fee might apply that specifically invoked the phrase "available balance." *Chambers*, 2016 WL 6155930, at *5.  The Opt-in Agreement at issue here does not contain any examples that might point to the "available balance" as the basis for overdraft fees.

uses the available balance or the actual/ledger balance to determine whether the member's account has enough money in it to cover a transaction.

Advia argues that the Opt-in Agreement is substantially similar to Model Form A-9, and thus, it cannot be liable for violating the EFTA. However, Pinkston-Poling argues that the phrase "enough money in your account" can be understood to mean the actual/ledger balance, and if her interpretation is correct, the Opt-in Agreement fails to provide an accurate description of Advia's overdraft service. *See Gunter*, 2016 WL 3457009, at *4 (concluding that the plaintiff stated a valid claim for violation of the EFTA where the opt-in agreement was "ambiguous in regards to how the credit union determines whether there is enough money in a customer's account"). Thus, because the language of the Opt-in Agreement is at least ambiguous, Pinkston-Poling states a claim for violation fo the EFTA.

## III.  CONCLUSION

For the foregoing reasons, the Court will deny Advia's motion to dismiss and allow Plaintiff's breach of contract and EFTA claims to proceed.[5]

A separate order will enter.


Dated: December 29, 2016                               /s/ Gordon J. Quist
                                                      GORDON J. QUIST
                                                UNITED STATES DISTRICT JUDGE

---

[5]At oral argument, Pinkston-Poling's counsel gave an example in which two transactions resulted in two overdraft fees, even though there was enough money in the account to cover one of the transactions. Counsel further stated that "what this process does is turn what should have been one overdraft fee, we are not disputing that, one overdraft fee into two overdraft fees." (ECF No. 36 at PageID.774–75.) Frankly, the Court was taken aback by counsel's example and statements because they were at odds with the facts alleged in the amended complaint. That is, as the Court reads the amended complaint, Pinkston-Poling alleges that she should not have been charged a fee at all because the actual balance covered the $7.00 debit card transaction. For the reasons stated herein, the Court finds that Pinkston-Poling states valid claims based on the allegations in her amended complaint. Because an amended complaint, rather than counsel's statements, is the appropriate means to inject new factual allegations into a case, *see Mohlman v. Deutsche Bank Nat'l Trust Co.*, No. 15-11085, 2016 WL 826049, at *2 (E.D. Mich. Mar. 3, 2016), the Court will disregard counsel's statements and treat the factual allegations in the amended complaint as controlling.

13