UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

BECKY PINGSTON-POLING, individually
and on behalf of all others similarly situated,

    Plaintiff,

v.                                        Case No. 1:15-CV-1208

ADVIA CREDIT UNION,              HON. GORDON J. QUIST

    Defendant.
_____/

## OPINION REGARDING DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

Defendant, Advia Credit Union, moves for summary judgment on Plaintiff Becky Pingston-Poling's[1] claims for violation of the Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693, *et seq.* and breach of contract on the grounds that the claims are barred by the applicable statutes of limitation. Advia further argues that, in the absence of Pingston-Poling's EFTA claim, the Court lacks jurisdiction under the Class Action Fairness Act to entertain Pingston-Poling's state-law breach of contract claim.

For the reasons explained below, the Court concludes that neither claim is time-barred. Therefore, the Court will deny Advia's motion.

### I. BACKGROUND

In her First Amended Class Action Complaint, Pingston-Poling alleges that Advia violated Regulation E of the EFTA by using an Opt-in Agreement that failed to adequately describe Advia's overdraft service, as required by 12 C.F.R. § 1005.17(d)(1). More specifically, Pingston-Poling

---

[1] Throughout this litigation, the Court and the parties, including Pingston-Poling's own counsel, have erroneously referred to the plaintiff as Becky Pinkston-Poling. The Court will direct the Clerk to change the caption to reflect the plaintiff's true name, Becky Pingston-Poling.

claims that the Opt-in Agreement failed to notify members that Advia used the available balance as the basis for imposing overdraft fees, instead of the actual/ledger balance in the member's account.[2] Pingston-Poling further claims that Advia breached the Member Account Agreement and the Opt-in Agreement by charging her an overdraft fee based on her available account balance, instead of her actual/ledger balance.

The Court's December 29, 2016, Opinion regarding Advia's motion to dismiss set forth the pertinent facts supporting the claims. The facts herein are thus limited to those pertaining to Advia's statute of limitations argument.

Pingston-Poling became a member of Advia on or around May 21, 2009, when it was known as First Community Federal Credit Union (First Community/Advia).[3] (ECF No. 103-1 at PageID.3574, 3577.) The terms of the First Community/Advia Account Agreement in effect when Pingston-Poling became a member pertaining to when a member's account will be overdrawn and when funds will be available for a member to use have remained unchanged over the years. (ECF No. 103-3 at PageID.2664; ECF No. 103-7 at PageID.3739.)

In November 2009, the Board of Governors of the Federal Reserve System amended Regulation E to limit the ability of a financial institution to assess an overdraft fee for paying an ATM or one-time debit card transaction that overdraws a consumer's account, unless the consumer consented or affirmatively opted into the institution's overdraft program. *See* 74 Fed. Reg. 59033 (Nov. 17, 2009). The affirmative consent requirement became effective for accounts opened prior

---

[2]The actual/ledger balance is the amount of money in the member's bank account without any reduction for anticipated future debits. The available balance, on the other hand, is an internal calculation that subtracts anticipated future debits from the actual balance. (ECF No. 38 at PageID.849–50.)

[3]Pingston-Poling's husband, Adam Poling, was a member of First Community/Advia at that time. Thereafter, they were and remain joint account holders at First Community/Advia.

to July 1, 2010, on August 15, 2010. 12 C.F.R. § 1005.17(c)(1). Pingston-Poling opted in to Advia's overdraft protection program on June 22, 2010. (ECF No. 103-1 at PageID.3574.)

Pingston-Poling first overdrew her Advia checking account on May 29, 2009. (ECF No. 103-1 at PageID.3574; ECF No. 103-9 at PageID.3775.) Following her opt-in consent to Advia's "Courtesy Pay" overdraft program, Advia assessed Pingston-Poling an overdraft fee in connection with a one-time debit card transaction on August 30, 2010. (ECF No. 103-1 at PageID.3575; ECF No. 103-10 at PageID.3783.)

## II. DISCUSSION

In its instant motion, Advia argues that both claims are barred by the applicable limitations period—EFTA, one year, and breach of contract, six years—because Pingston-Poling incurred her first overdraft fee after opting-in to Advia's overdraft program on August 30, 2010, and she first overdrew her account and incurred an overdraft charge on May 29, 2009.

### A.  EFTA Claim

A plaintiff may bring an EFTA claim "in any United States district court, or any other court of competent jurisdiction, within one year from the date of the occurrence of the violation." 15 U.S.C. § 1693m(g). In *Wike v. Vertrue, Inc.*, 566 F.3d 590 (6th Cir. 2009), the Sixth Circuit addressed the issue of when the plaintiff's claim—that the defendant violated the EFTA's requirement for written preauthorization for recurring electronic fund transfers from a consumer's account, *see* 15 U.S.C. § 1693e(a)—accrued for purposes of § 1693m(g). The court held that a cause of action accrues when the transfer occurs, rather than at the time the transfers were arranged, as the defendant had argued. *Id.* at 593. The court found that its conclusion was consistent with the pertinent statutory provisions, the "'standard rule'" that "the statute of limitations begins to run 'when the plaintiff has a complete and present cause of action' and thus 'can file suit and obtain

relief,'" and the practicalities of recurring future transfers. *Id.* (quoting *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201, 118 S. Ct. 542, 549 (1997)). The court noted, "[a] consumer is injured only if, and only when, funds are withdrawn from her account." *Id.* Because the first transfer occurred within the one-year period, the plaintiff's claim was timely. *Id.* at 596.

The *Wike* court did not consider whether a new limitations period begins each time a transfer occurs in recurring transactions. However, several district judges, including the undersigned, have addressed the issue. As Advia notes, in *Wheeler v. Native Commerce Studios, LLC*, No. 2:17-CV-51, 2018 WL 447716 (W.D. Mich. Jan. 17, 2018), this Court noted that "a majority of district courts have held that the statute starts to run on all recurring payments upon completion of the first payment," *id.* at *1 (citing *Harvey v. Google Inc.*, No. 15-cv-03590-EMC, 2015 WL 9268125, at *3 (N.D. Cal. Dec. 21, 2015)), and held that the plaintiff's EFTA claim was time-barred because he filed his complaint more than a year after the first recurring transfer. *Id.* at *2. Courts applying this rule have reasoned that "the EFTA does not require that the payee obtain a separate written authorization for each transfer," but instead requires only "a single written authorization for the entire series of transfers." *Repay v. Bank of Am., N.A.*, No. 12 CV 10228, 2013 WL 6224641, at *4 (N.D. Ill. Nov. 27, 2013.) Thus, in recurring transfer cases, "rather than alleging a series of wrongful acts, [a plaintiff] alleges a wrongful omission: failing to obtain written authorization for the series of transfers that were agreed upon and to provide a copy to the consumer." *Id.*; *see also Camacho v. JPMorgan Chase Bank*, No. 5:14-cv-04048-EJD, 2015 WL 5262022, at *4 (N.D. Cal. Sept. 9, 2015) (noting that "[i]n cases involving unauthorized transfers, courts interpret § 1693m(g) to require that EFTA claims be filed within one year of the date of the first recurring transfer"). As this Court noted in *Wheeler*, at least one court has held that each subsequent transfer following the

initial transfer in a recurring transfer transaction is independently actionable because "[e]ach transfer constitutes a new harm above and beyond the prior harm of a prior transfer and it amounts to an independent violation of section 1693c." *Diviacchi v. Affinion Grp., Inc.*, No. 14-10283-IT, 2015 WL 3631605, at *10 (D. Mass. Mar. 11, 2015) *report and recommendation adopted*, 2015 WL 3633522 (D. Mass. June 4, 2015).

In contrast to *Wike*, *Wheeler*, and the other cases cited above, the instant case does not involve a "preauthorized electronic fund transfer" because it was not "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(10). Nonetheless, Advia urges the same rule—the limitations period for all overdraft fees commenced when Advia charged Pingston-Poling the first overdraft fee after Pingston-Poling opted-in to Advia's overdraft program. Advia cites *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338 (D.N.H. 2018), and *Whittington v. Mobiloil Federal Credit Union*, No. 1:16-CV-482, 2017 WL 6988193 (E.D. Tex. Sept. 14, 2017), both of which applied the "first transfer" rule in overdraft fee cases which, like this one, did not involve recurring transfers.

Pingston-Poling counters that this case does not involve recurring transfers, but instead, non-recurring charges which do not merit the same rule. She notes that the charges she incurred were not pursuant to a single directive that more or less authorized a single transaction involving a course of payments over a period of time. Rather, Pingston-Poling argues, the fees she incurred were separate fees, each of which required an independent assessment that an overdraft occurred and whether or not an overdraft fee should be assessed. Pingston-Poling contends that this Court should adopt the reasoning in *Smith v. Bank of Hawaii*, No. 16-00513 JMS-RLP, 2018 WL 1662107 (D. Haw. Apr. 5, 2018), an overdraft fee case in which the court held that each overdraft fee debited from the plaintiff's account constitutes a separate violation of Regulation E. The court in *Smith* observed:

5

> [the reasoning of] *Wike* cannot logically be extended to the facts of this case, which involves allegedly *unauthorized* overdraft fees. The difference between preauthorizing a series of transfers and opting in to an overdraft service is both significant an meaningful. In the first instances, a consumer gives express permission for a series of recurring transfers from his or her account. But in the second instance a consumer merely opts in to a service, perhaps with no intention of ever using it, and he or she does not agree to any specific fee of charge, let alone a series of them.

*Id.* at *5 (italics in original and footnote omitted). The court also reasoned that unlike a recurring transfer case, which involves a singular omission—the failure of the payee to obtain the required written authorization—an assessment of overdraft fees violates Regulation E each time the fee is imposed. *Id.* The *Smith* court analogized overdraft fees to the circumstances in *O'Brien v. Landers*, No. 1:10-cv-02765, 2011 WL 221865 (N.D. Ill. Jan. 24, 2011)—in which the plaintiff alleged that the defendant violated Regulation E by twice debiting the plaintiff's account for one-time charges that were beyond the scope of the plaintiff's preauthorization for recurring transfers for monthly membership fees. The *O'Brien* court concluded that the plaintiff stated a claim under the EFTA, in spite of his preauthorization, because the one-time charge was not covered by the preauthorization and the defendant never notified the plaintiff that his account would be debited for such charges or explained to him the reason for the charge. 2011 WL 221865, at *2. The *Smith* court noted that while *O'Brien* did not address a statute of limitations issue, it illustrated the difference between an overdraft fee and a recurring transfer. 2018 WL 1662107, at *5.

This Court agrees with the reasoning in *Smith*, which acknowledges and explains why overdraft fees constitute discrete harms that do not constitute a single transaction providing for recurring transfers. The Court does not find *Walbridge*, which cited *Wheeler*, or *Whittington* persuasive because neither case considered the differences between preauthorized recurring transfers and non-recurring overdraft fees. Rather, both cases simply apply the rule for recurring transactions

6

to non-recurring overdraft charge without analysis.[4] *See Smith*, 2018 WL 1662107, at *5 n.3 (noting that *Whittington* applied "*Wike* without analyzing its differing factual circumstances").

**B.     Breach of Contract**

In Michigan, a breach of contract claim is subject to a six-year statute of limitations. M.C.L. § 600.5807(8); *see Rowry v. Univ. of Mich.*, 441 Mich. 1, 10, 490 N.W.2d 305, 308 (1992). "[I]n a breach of contract action, the statutory period generally begins to run on the date that the breach occurs." *Seyburn, Kahn, Ginn, Bess, Deitch & Serlin, P.C. v. Bakshi*, 483 Mich. 345, 358, 771 N.W.2d 411, 418 (2009).

Similar to the EFTA claim, Advia argues that Pingston-Poling's claim accrued on May 29, 2009, when Advia first assessed an overdraft fee against Pinkston-Poling's account. Advia cites *Commercial Coin Laundry Systems v. McGraw*, No. 256026, 2005 WL 3481459 (Mich. Ct. App. Dec. 20, 2005) (per curiam) as support for its argument. The contract at issue in *Commercial Coin Laundry* granted the plaintiff exclusive rights to maintain laundry machines in the defendant's apartment complex. At the commencement of the contract, the defendant had approximately 125 washer/dryer units of its own in the complex, which constituted a breach. The plaintiff argued that because the contract prohibited the defendant from allowing washer/dryer units other than those owned by the plaintiff in the complex, a separate breach occurred each time one of the defendant's machines was operated. The court rejected the plaintiff's argument that the contract was akin to an installment contract:

> The present case involves neither a pension agreement nor a contract resembling an installment contract. The parties' lease contract simply does not contemplate separate installment payments where a breach could arise from a failed performance or payment on a separate installment. The parties (sic) contract was a

---

[4] Because the Court concludes that Pingston-Poling's EFTA claim is not time-barred, the Court need not address Pingston-Poling's discovery rule argument.

7

> simple lease agreement with rent coming from a percentage of revenue generated by the machines. . . . In this case, there was not separate acceptance or separate installment procedures within the parties (sic) lease agreement. Therefore, we find that plaintiff's breach of contract accrued on the date defendant admitted it first breached the agreement: April 23, 1992.

*Id.* at *2. Advia argues *Commercial Coin Laundry* applies in this case because Pingston-Poling alleges that the Account Agreement and the Opt-in Agreement both preclude Advia from assessing fees to her account so long as she has sufficient funds to cover her transactions. Advia contends Pingston-Poling's claim first accrued when Advia assessed the first overdraft fee, and because neither agreement is in the nature of an installment contract, there was no separate breach each time thereafter that Advia assessed an overdraft fee.

Pingston-Poling argues that this case is more analogous to *H. J. Tucker & Associates, Inc. v. Allied Chucker and Engineering Co.*, 234 Mich. App. 550, 595 N.W.2d 176 (1999), and *Harris v. City of Allen Park*, 193 Mich. App. 103, 107, 483 N.W.2d 434 (1992), both of which *Commercial Coin Laundry* distinguished. *H. J. Tucker* concerned the defendant's failure to pay the full amount of commissions, which were separately computed and paid to the plaintiff monthly. 234 Mich. App. at 562–63, 595 N.W.2d at 183. *Harris* involved claims for monthly pension benefits. 193 Mich. App. at 107, 483 N.W.2d at 436. The courts in both cases concluded that the contracts were similar to installment contracts. Pingston-Poling argues that, as in *H. J. Tucker* and *Harris*, Advia's imposition of each overdraft fee constituted a separate breach because each fee was imposed in connection with a separate transaction.

Although the agreements at issue cannot be considered analogous to installment contracts—because they do not call for periodic payments or performances—the Court also concludes that *Commercial Coin Laundry* is not applicable. In contrast to *Commercial Coin Laundry*, Advia breached the agreements each time it imposed an overdraft fee based on a separate

transaction. Thus, in this regard, the instant case is closer to *H. J. Tucker* and *Harris*. Moreover, in *Blazer Foods, Inc. v. Restaurant Properties, Inc.*, 259 Mich. App. 241, 673 N.W.2d 805 (2003)—which rejected the "continuing wrong" doctrine in breach of contract claims—the court noted that the plaintiffs were not necessarily precluded from recovering. *Id.* at 251, 673 N.W.2d at 812. The court observed:

> When one party to a contract materially breaches the contract by failing to perform duties under it, the other party can either consider the contract terminated and sue for total breach, or he can continue his performance and sue for partial breach. Thus, when one elects to continue performance and a second breach occurs, it should give rise to a separate claim for specific damages arising from the second breach, whether or not the contract is deemed an installment contract.

*Id.* at 241 n.7, 673 N.W.2d at 812 n.7.

Accordingly, Pingston-Poling's breach of contract claim is timely.

### III. CONCLUSION

For the foregoing reasons, the Court will deny Advia's motion for summary judgment.

A separate order will enter.

Dated: August 8, 2018  /s/ Gordon J. Quist
GORDON J. QUIST
UNITED STATES DISTRICT JUDGE

9